JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, a nombre y en representación de THE SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC GULF, LAKES, AND INLAND WATER DISTRICT, AFL–CIO (PUERTO RICO DIVISION), peticionaria, v. VALENCIA BAXT EXPRESS, INC. y MARITIME TRUCKING, INC., demandadas; THE SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC GULF, LAKES AND INLAND WATER DISTRICT, AFL–CIO (PUERTO RICO DIVISION), interventora.

*Número:* JRT–62–2      *Resuelto:* 25 de octubre de 1962

*Juan B. Fernández Badillo, Procurador General, José Orlando Grau* y *J. F. Rodríguez Rivera,* abogados de la peticionaria; *Elí B. Arroyo* y *Paul Stawinski,* abogados de las demandadas; *Torres Peralta & Vizcarra* y *Federico Rodríguez Pagán,* abogados de la Unión.

Sala integrada por el Juez Asociado Señor Hernández Matos como Presidente Accidental de Sala y los Jueces Asociados Señores Santana Becerra y Blanco Lugo.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

La Junta de Relaciones del Trabajo de Puerto Rico representada por el Procurador General compareció ante este Tribunal a nombre y en representación de Seafarers International Union of North America, Atlantic, Gulf, Lakes and Island Waters District, AFL-CIO (Puerto Rico Division),

en este caso la Unión, en solicitud de que ordenemos a Valencia Baxt Express Inc. y Maritime Trucking, Inc., en este caso los Patronos, a que cumplan con un laudo de arbitraje. Ley de Relaciones del Trabajo de Puerto Rico, Núm. 6 de 7 de marzo, 1946, Art. 9(2) (c), —29 L.P.R.A. sec. 70(2) (c).

. Alega la Junta que en 17 de marzo de 1961 las partes firmaron cierta estipulación en que se obligaban a negociar comenzando el viernes 24 de marzo de 1961. De no llegarse a un acuerdo dentro de los 15 días siguientes al comienzo de las negociaciones, entonces todo el asunto [*the entire matter*] sería sometido a arbitraje para su solución. El Secretario del Trabajo del Estado Libre Asociado de Puerto Rico designaría un árbitro. La decisión del árbitro se emitiría dentro de los 30 días siguientes a la sumisión y sería final y obligatoria para ambas partes.

En 19 de abril de 1961 el Secretario del Trabajo envió una comunicación al Sr. Eduardo Gracia informándole que el estado de huelga entre la Unión y los Patronos había quedado resuelto mediante una estipulación el día 17 de marzo de 1961 suscrita por los representantes de las partes mencionadas; que el 12 de abril de 1961 el Presidente de la Unión le había informado de la inhabilidad de las partes para ponerse de acuerdo y solicitó la designación del árbitro, y que de acuerdo con dicha estipulación le designaba árbitro y le incluía copia de la misma para la acción que él estimara pertinente. Después de los trámites de rigor, el 10 de agosto de 1961 el árbitro emitió un laudo. Debido a la naturaleza del planteamiento que los Patronos han suscitado en este caso, transcribimos a continuación aquellas partes del laudo en que el árbitro interpreta la sumisión y su facultad para resolver:

*"Conclusiones sobre las Cuestiones a Decidir*

"El acuerdo de sumisión firmado por las partes el 17 de marzo de 1961 Exhibit I expone las cuestiones y el procedimiento general a seguir en el arbitraje en sus párrafos 3, 4 y 5, extractados a continuación:

'3. Negotiations to commence Friday, March 24th, 1961. If agreement cannot be reached within 15 days after commencement of negotiations, then the entire matter shall be submitted to arbitration for settlement. The Secretary of Labor of the Commonwealth of Puerto Rico shall designate such arbitrator.

'4. The decision of such arbitrator shall be made within 30 days of such submission.

'5. The decision shall be final and binding on both parties...'

"La estipulación para arbitrar es sumamente general en lo que se refiere a las cuestiones (issues) sujetos a este arbitraje. La estipulación solo indica '. . . *then the entire matter shall be submitted to arbitration for settlement . . .*' [Énfasis del árbitro.] ¿Cuál es el alcance de la frase 'the entire matter'? ¿Cuáles son las materias sujetas a este arbitraje? Para llegar a una determinación sobre los issues del caso necesariamente hay que buscarla en los alegatos de las partes y en las expresiones que sobre este mismo asunto han hecho las partes. *Exhibits 6, 7, 8, 14, 15, Récord Taquigráfico de las Vistas.*"

"ALEGATO DE VALENCIA BAXT EXPRESS, INC.

4 de mayo de 1961. *Exhibit 8*

"1. Que el Convenio Colectivo firmado con la Unión el 27 de noviembre de 1957 sigue en efecto y no expira hasta el 30 de noviembre de 1961.

"2. Que aun cuando la alegación de la Unión de que no existe un Convenio después del 1ro. de diciembre de 1960 fuese correcta, la Unión violó dicho convenio al irse a la huelga en vez de acogerse a la cláusula de arbitraje del susodicho Convenio.

"3. Que la S. I. U. (la Unión) no debe comparecer como parte en este procedimiento de arbitraje ya que perdió la representación de los obreros de Valencia Baxt Express. Esta es una cuestión que compete a la Junta de Relaciones del Trabajo, y por lo tanto el Árbitro no tiene jurisdicción en este caso.

"4. Suponiendo que estas alegaciones fuesen rechazadas y su rechazo fuese correcto, Valencia Baxt Express no está en posición económica para absorver [*sic*] un aumento de salarios y en el costo de otras cláusulas económicas del convenio. Además, un aumento en sus costos la pondría en desventaja competitiva con otras compañías de camiones."

"ALEGATO DE MARITIME TRUCKING CO., INC.

"4 de mayo de 1960. *Exhibit 7*

1. Que el Convenio Colectivo firmado con la Unión el 30 de diciembre de 1957 sigue en efecto y expira el 3 de junio de 1961.

"2. Que este procedimiento de arbitraje es académico ya que la certificación de la Unión expira el 3 de junio de 1961; y porque la Unión ha expresado que no desea la representación de los obreros de Maritime Trucking Company.

"3. Suponiendo que estas alegaciones fuesen rechazadas, y mi rechazo fuese correcto, Maritime Baxt Trucking Co., Inc. no está en posición económica para absorver [sic] un aumento de salarios y en el costo de otras cláusulas económicas del Convenio. Además, un aumento en sus costos la pondría en desventaja competitiva con otras compañías de camiones."

"ALEGATO DE LA UNIÓN.—5 de mayo de 1961. Exhibit 15.

"1. Que la Unión firmó Convenio Colectivo con Valencia Baxt Express el 27 de noviembre de 1957 y con Maritime Trucking Company el 9 de enero de 1958, y que ambos convenios expiraron el 30 de noviembre de 1960.

"2. Que la Unión y los dos Patronos negociaron para un nuevo convenio y las negociaciones culminaron en una huelga que se terminó con la estipulación de arbitraje del 17 de marzo de 1961.

"3. Que los Patronos denegaron una petición de la Unión para examinar los libros de ambas empresas con el propósito de obtener información pertinente de carácter económico con el fin de someterla al Árbitro.

.    .    .    .    .    .    .    .    .

"Respecto a los méritos del caso el Árbitro entiende que la única cuestión sometida a él para resolver es la relativa a los convenios colectivos entre las partes y las cuestiones específicas relacionadas con estos convenios que motivaron el acuerdo de sumisión del 17 de marzo de 1961. El Árbitro entiende que los issues a resolverse son los siguientes:

"1. Si el Convenio Colectivo firmado entre la Unión y Valencia Baxt Express el 27 de noviembre de 1957 sigue en efecto o expiró el 30 de noviembre de 1960.

"2. Si el Convenio Colectivo firmado entre la Unión y Maritime Trucking Company el 30 de diciembre de 1957 sigue en efecto o expiró el 30 de noviembre de 1960.

"3. De haber habido una renovación automática de estos dos convenios con fecha de 30 de noviembre de 1960 el arbitraje sería sobre las cláusulas económicas del convenio anterior.

"4. De haber expirado estos dos convenios el 30 de noviembre corresponde al Árbitro decidir el nuevo convenio que regirá entre las partes; incluyendo entre otras cosas:

a) Formato y lenguaje, y término de duración del nuevo convenio con Valencia Baxt Express, Inc.

b) Formato y lenguaje, y término del nuevo convenio con Maritime Trucking Company.

c) Decidir sobre los cambios propuestos en las cláusulas económicas y las condiciones de trabajo, aplicable a ambos convenios.

d) Fecha de retroactividad de las cláusulas económicas aplicable a ambos convenios."[1]

Resolvió el árbitro que los convenios colectivos existentes entre la Unión y los Patronos habían expirado el 30 de noviembre de 1960; que por haber notificado la Unión en tiempo hábil su deseo de seguir negociaciones, no hubo renovación automática de dichos convenios el 1ro. de diciembre de 1960; que habiendo expirado dichos convenios debía formularse uno nuevo que rigiera las relaciones entre la Unión y cada Patrono por un término de dos años a partir del 1ro. de diciembre de 1960 e interpretó la sumisión en el sentido de

---

[1] En adición a lo transcrito el árbitro hizo constar que durante los procedimientos un grupo de trabajadores de estos Patronos hicieron saber al Departamento del Trabajo que estaban en contra de los procedimientos de arbitraje, impugnando la representación de la Unión. En vistas posteriores los Patronos objetaron el procedimiento de arbitraje debido a las protestas y objeciones de un grupo de sus obreros contra el mismo, contra el árbitro y contra la Unión. También solicitaron la suspensión de los procedimientos y que el árbitro se descualificara bajo imputaciones de prejuicio y parcialidad. Aparentemente se desarrollaba a la vez un problema de representación en que parte de los obreros repudiaban a la Unión, sobre el cual el árbitro no actuó a base de que ello competía a la Junta de Relaciones del Trabajo.

que le autorizaba a redactar ese convenio.(²)  Por la importancia que tiene para el planteamiento hecho, unimos una transcripción literal de esa parte del laudo como *Apéndice A* de esta opinión.  ■

En 14 de febrero de 1962 concedimos 10 días a los Patronos para que mostraran causas, si las tuvieren, por las cuales no debía ponerse en vigor el laudo.(³)  En 20 de febrero radicaron notificación de haber solicitado el traslado del caso a la Corte de Distrito de los Estados Unidos para Puerto Rico, traslado que se denegó finalmente por dicho Tribunal en 10 de julio de 1962.  Los Patronos han comparecido y solicitan la desestimación del recurso alegando que se trata de un laudo de naturaleza cuasi-legislativa y siendo la ley federal sustantiva la que debe regir, no procede que sea puesto en vigor por este Tribunal.  ■

Independientemente del planteamiento de los Patronos, es muy cuestionable que se deba poner en vigor aquella parte del laudo que consiste de un convenio colectivo a regir entre las partes, por cuanto es dudosa la facultad del árbitro en tal sentido bajo la sumisión.(⁴)  ■

En *Ríos* v. *Puerto Rico Cement Corp.*, 66 D.P.R. 470, dijimos, (477) que como regla general un laudo puede ser impugnado o anulado si existe algún defecto o *"insuficiencia"*

---

(²) El laudo hace comparecer a la Unión y a los Patronos a disponer sobre materias tales como: reconocimiento de la Unión, taller unionado, selección de nuevo personal, período probatorio, día de trabajo y semana de trabajo, días feriados, arbitraje, primer paso, segundo paso, tercer paso, descuentos de cuotas *"check-off"*, vacaciones y licencias por enfermedad, fondo de bienestar, antigüedad, disposiciones generales, compensación mínima, salarios, huelgas y cierres, retroactividad de salarios y vigencia.

(³) Por separado compareció la Unión representada por las abogadas señoritas Torres Peralta y Vizcarra pidiendo intervenir.  En este pleito tal intervención no procede.  Art. 9(2)(c) Ley 6 de 7 de marzo de 1946. Permitimos, en ausencia de objeción, Art. 10, la representación legal de dichas señoritas abogadas junto a la del Procurador General.

(⁴) La Ley 376 de 8 de mayo de 1951 autoriza y reglamenta el arbitraje comercial, y dispuso expresamente que la misma no se aplica a convenios de arbitraje entre patronos y empleados, que continuarían rigiéndose por la Ley de Relaciones del Trabajo y por cualquier otra ley que

en la *sumisión*. Ratificamos esto en *Junta de Relaciones del Trabajo* v. *N. Y. & P. R. SS. Co.*, 69 D.P.R. 782, 796 y en adición, dijimos: (pág. 803) "Precisamente porque un laudo de arbitraje es final y obligatorio, el árbitro no determina su propia jurisdicción, a no ser que las partes lo acuerden. Compete a las cortes y no al árbitro *interpretar* el convenio de arbitraje *con el fin de determinar qué cuestiones fueron sometidas a arbitraje por las partes*. Y los contratos sobre arbitraje serán *minuciosamente* interpretados con el propósito de *no forzar a una parte* a someter a arbitraje una cuestión que *no fue su intención* someter a arbitraje." [citas] Y a la *pág.* 805: "Como hemos visto, debido a que las partes vienen obligadas por un laudo de arbitraje y las cortes no lo pueden revisar en los méritos, *un convenio de sumisión* es interpretado *minuciosamente* para evitar la resolución de cuestiones que no fueron sometidas a arbitraje. Toda vez que el convenio de sumisión no le confiere claramente al Comité autoridad para conceder paga retroactiva con anterioridad al 9 de enero de 1948, el laudo no puede ser puesto en vigor en tanto en cuanto ordena paga retroactiva con anterioridad a dicha fecha." [Énfasis puesto.]* ■

El contrato de sumisión en este caso es la estipulación de 17 de marzo de 1961. Sabemos que había un estado de huelga, pero el récord no dice qué demandas o controversias específicas eran objeto del paro. Podía tal vez basarse en una divergencia de criterio en cuanto a si el convenio anterior estaba o no vigente o si se había renovado o no, y también pudo haber otras demandas o controversias. No sabemos. El propio árbitro se sintió perplejo ante la vaguedad e insuficiencia de la sumisión, haciéndose varias preguntas.

se aprobare para regular el arbitraje de problemas obrero-patronales. La Ley de Relaciones del Trabajo no reglamenta el arbitraje laboral, y no hay otra legislación específica en tal sentido. No obstante, a los problemas de arbitraje obrero-patronal este Tribunal les ha estado aplicando principios generales en la doctrina que rige la materia de arbitraje. Cfr: *Autoridad Sobre Hogares* v. *Tribunal Superior*, 82 D.P.R. 344, 355.

　　* Una de las disposiciones del laudo de este caso cuasi-legislativo es la paga de los salarios retroactivamente.

Todo el asunto o la cuestión completa [*"the entire matter"*] es, en cuanto al récord ante nos respecta, un estado de huelga. Según el mismo árbitro expresa, halló complemento al convenio de sumisión en expresiones de las partes durante los procedimientos ante él. Pero asumiendo que tales expresiones en el curso de los procedimientos curaran el defecto fundamental de la sumisión, de acuerdo a como él mismo las expone resulta carente de base y de dudosa validez la conclusión interpretativa a la cual llegó en el sentido de que estaba autorizado por la sumisión a escribir todo un convenio colectivo obligatorio para las partes, máxime cuando ello, en ausencia de una autorización clara, específica y libre de toda duda y ambigüedad, podría no responder, como veremos más tarde, a una mejor y más deseable norma en el campo de las relaciones obrero-patronales. ■

Los Patronos sostienen que las cortes federales no ponen en vigor un laudo de naturaleza cuasi-legislativa, y que debemos en este caso aplicar la ley federal sustantiva. No se discute que estos Patronos están sujetos a la legislación federal sobre Relaciones Obrero-Patronales, Taft-Hartley. Es indiscutible que esa parte del laudo constituye una pieza legislativa del árbitro para reglamentar prospectivamente las relaciones, derechos y deberes de las partes durante un período de dos años.

Veamos la situación federal. En *Boston Printing Pressmen's Union* v. *Potter Press*, 241 F.2d 787, la Corte de Apelaciones del Primer Circuito se negó a hacer cumplir parte de un convenio colectivo en tanto ello conduciría, de hacerlo cumplir, a un laudo de esta naturaleza, aunque mucho más limitado que el del presente caso. La unión y el patrono habían acordado en un convenio colectivo que si cualquiera de las partes deseaba un cambio o modificación de cualquiera de los términos del mismo debía dar notificación en cierto momento, de lo contrario el convenio continuaría en vigor por otro año. El convenio creó un comité de arbitraje al cual se le referirían todos los problemas que surgieran que

afectaran el mismo, la interpretación de cualquiera de sus cláusulas o cualquier violación del convenio que no pudiera resolverse de otra manera. Se acordó específicamente que todas las cuestiones relativas a un nuevo convenio a ser efectivo al terminar ese que no pudieran ser resueltas mediante conciliación, serían decididas por arbitraje.

La unión notificó al patrono su deseo de discutir ciertos cambios en los términos y condiciones de trabajo. Siguieron algunas negociaciones y más tarde la unión informó que tres cuestiones referentes a una renovación del convenio no se habían solucionado mediante conciliación, las cuales eran vacaciones por tres semanas con paga, dos días feriados adicionales y un programa de enfermedad y accidentes; y requirió al patrono para que sometiera esos tres asuntos al comité de arbitraje de acuerdo con el convenio colectivo. El patrono respondió que el convenio no creaba una obligación válida que pudiera hacerse cumplir de someter a arbitraje los términos de la renovación del convenio. La unión acudió entonces a la Corte de Distrito federal solicitando una orden que obligara al patrono a someter a arbitraje esas cuestiones. El patrono pidió la desestimación de los procedimientos y se desestimaron.

La Corte de Apelaciones sostuvo que la corte federal tenía poder para conocer de los procedimientos y ordenar el cumplimiento específico de una disposición de un convenio colectivo que obligaba a las partes a someter una disputa a arbitraje, bajo lo decidido por ella misma en *Local 205, United Electrical, etc.* v. *General Electric*, 233 F.2d 85. Esta decisión fue confirmada por el Tribunal Supremo de Estados Unidos con posterioridad al fallo de *Boston Printing Pressmen's Union*, en *General Electric Co.* v. *Local 205*, 353 U.S. 547. Pero a pesar de reconocer poder a la Corte de Distrito para obligar al cumplimiento de disposiciones de un convenio colectivo, —Sec. 30, Ley de Relaciones del Trabajo de 1947, 29 U.S.C.A. 1 Sec. 185 (a), —observó no obstante la de Apelaciones que en ese caso la Corte de Distrito había señalado

una radical diferencia con el de *General Electric* en el sentido de que ahora se solicitaba el cumplimiento específico de un acuerdo del convenio colectivo para someter a arbitraje un nuevo convenio que regiría las condiciones de trabajo después de expirar el convenio en vigor, o sea, citando a la Corte de Distrito, que "a la Corte se le pedía que ordenara lo que convenientemente podría describirse un arbitraje prospectivo o cuasi-legislativo estableciendo futuras condiciones del trabajo no consideradas específicamente en el convenio anterior." Y expresó la Corte de Apelaciones citando de nuevo a la de Distrito, que asumiendo la constitucionalidad de un estatuto en que el Congreso, con sus ojos abiertos, pudiera autorizar a las cortes federales a poner en vigor laudos legislativos de árbitros, "el estatuto de arbitraje de Estados Unidos . . . sólo tiene que ver con el cumplimiento de laudos cuasi-judiciales dirigidos a la determinación de hechos en una controversia ya ocurrida y a la obtención de daños u otros beneficios apropiados por aquello que se hubiere violado, no por aquello que aun tuviere que crearse."

En la aun más documentada y elaborada opinión de la Corte de Distrito, 141 F. Supp. 553, el Juez Wyzanski observa que las cortes estatales han considerado generalmente que los problemas de laudos cuasi-legislativos caen más allá del alcance que se intentó darle a un estatuto de arbitraje a ser hecho cumplir judicialmente, a menos que, y de todos modos, la Legislatura se hubiera manifestado claramente en favor de la más amplia interpretación posible. El Juez Wyzanski, sin embargo, no dispuso del asunto sólo a base del problema técnico presentado. Considerándolo como un novel problema hasta ahí no resuelto por las cortes federales, y pendiente de lo que podría ser el efecto de la controversia en el área delicada de las relaciones del trabajo, dijo además: "Verdaderamente esta Corte no tiene información en cuanto a si es corriente en los contratos de trabajo incluir tales disposiciones cuasi-legislativas, ni, de ser corrientes, si su cumplimiento por las cortes sería en general deseado. . . . Tantas

dudas se agitan que una corte haría bien en actuar cautelosamente. . . . Esta corte no lo considera deseable saltar a lo que puede ser un foso sin fondo de controversia sobre condiciones de trabajo futuras. . . . De todos modos, si las cortes han de entrar en el campo de laudos obreros cuasi-legislativos, debe dejarse que los representantes del trabajo, los representantes del patrono y sobre todo los representantes del pueblo sean oídos primeramente en las Cámaras del Congreso." A pesar de las normas de política pública discutidas, el Tribunal Supremo se negó a revisar estas decisiones. 355 U.S. 817. Hasta este momento, en el ámbito federal esa es la ley aplicable.

Cabe observar también que aunque las dos decisiones de *Potter Press* ligan al problema la Ley de Arbitraje de Estados Unidos, 9 U.S.C., y en parte descansan en dicho estatuto, al confirmar el de la *Local 205* por la autoridad del caso de *Textile Workers Union of America* v. *Lincoln Mills of Alabama*, 353 U.S. 448, el Tribunal Supremo no siguió el criterio del Primer Circuito al efecto de que la Ley de Arbitraje proveía la causa de acción para compeler a arbitrar, sino que dicha causa de acción surgía de la Sección 301(a) de la Ley Taft-Hartley. En efecto, después de la decisión de *Lincoln Mills* la Ley de Arbitraje de Estados Unidos dejó de tener importancia en el problema suscitado.[5]

---

[5] En un procedimiento tramitado en septiembre de 1961 por los Patronos en la Corte de Distrito de Estados Unidos solicitando que se dejara sin efecto este laudo cuasi-legislativo, habiéndose opuesto la Unión, el Hon. Clemente Ruiz Nazario expresó que de haber la Unión solicitado en esa Corte que se pusiera en vigor dicho laudo contra el Patrono, la Corte se hubiera visto obligada a desestimar el caso por falta de jurisdicción bien bajo la Sección 301 de la Ley de Relaciones Obrero-Patronales o bajo la Ley de Arbitraje de Estados Unidos, obedeciendo a lo decidido por el Primer Circuito en el caso de *Potter Press*; y que la falta de jurisdicción de la Corte bajo el caso citado para hacer cumplir tal laudo cuasi-legislativo a petición de la Unión, le impedía dejarlo sin efecto a petición de los Patronos, 199 F. Supp. 103. Por igual fundamento la Corte de Distrito de Estados Unidos negó posteriormente el traslado de este caso en que se pide que se ponga en vigor el laudo. Cfr: *District 50, United Mine Workers* v. *Revere Copper and Brass, Inc.*, 204 F. Supp. 349, 352.

Cuando en *Lincoln Mills* el Tribunal Supremo resolvió de una vez las divergencias de criterio en cuanto a si la sección 301(a) de la Ley Taft-Hartley meramente concedía jurisdicción a las cortes federales en controversias que envolvían organizaciones del trabajo o si por el contrario dicha sección era fuente de ley sustantiva, resolviendo el Tribunal Supremo que sí lo era y que bajo la misma las cortes federales podían ordenar el cumplimiento específico de disposiciones de un convenio colectivo que obligaban a someterse a arbitraje, entrando ya en el problema de cuál ley sustantiva habría de aplicarse el Tribunal Supremo sostuvo que era la ley sustantiva federal, la cual podía ser modelada por las cortes a base de las normas de las leyes nacionales del trabajo. También, que la interpretación de las cortes federales de la ley federal regiría, no la ley local. No obstante se podría recurrir a la ley local, de ser compatible con los propósitos de la sección 301, a fin de encontrar la norma que mejor hiciere efectiva la política federal. Cualquier ley del estado que se aplicara, sin embargo, quedaría absorbida como ley federal y no constituiría una fuente independiente de derecho privado. ■

La Unión sostiene, invocando a *Dowd Box Co.* v. *Courtney*, 368 U.S. 502 y a *Teamsters Local* v. *Lucas Flour Co.*, 369 U.S. 95, que tenemos jurisdicción para entender en este caso. No cabe la menor duda de que tenemos jurisdicción para resolver este caso. *Dowd* es una modalidad de *Lincoln Mills*. Fundamentalmente resuelve que la sección 301(a) de la Ley de Relaciones Obrero-Patronales de 1947 no concede a las cortes federales jurisdicción de naturaleza exclusiva para conocer de violaciones a contratos entre patronos y empleados. Esa decisión no nos concede facultad adicional alguna que ya no tuviéramos según analizamos la situación en el caso de *New York & P. R. SS. Co.*, supra, y constituye una plena ratificación de lo que allí dijimos.(⁶) ■

(⁶) Aunque bajo el art. 8 de la Ley de Relaciones del Trabajo el violar los términos de un acuerdo colectivo incluyendo un acuerdo para acep-

Por otra parte, no llegamos a enfrentarnos a la situación del caso *Lucas Flour Co.*, (a las páginas 102 a 104) ni a *Atkinson* v. *Sinclair Refining Co.*, 370 U.S. 238, por cuanto no existe aquí conflicto abierto de ley local y de ley federal a ser decidido. No tenemos disposición de ley local que expresamente ordene, —o impida, —que laudos de esta naturaleza sean puestos en vigor por este Tribunal. ■

En ausencia de ley nuestra que expresamente nos obligue a poner en vigor un laudo cuasi-legislativo, de tener que optar entre dos normas, tratándose de los Patronos cubiertos por la legislación federal, es lógico y conveniente, en aras de la uniformidad deseable en las normas que deben regir los problemas obrero-patronales de entidades cubiertas por dicha legislación, que optemos por aplicar la ley federal sustantiva sobre el asunto, que ha negado la acción judicial para hacer cumplir un convenio colectivo de arbitraje en tanto conduciría a un laudo prospectivo de naturaleza cuasi-legislativa o para hacer cumplir tal laudo de haberse emitido. Cfr: *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc.*, 271 F.2d 402, (C.A. 2) *cert.* concedido: 362 U.S. 909, desestimado: 364 U.S. 801; *Metro Industrial Painting Corp.* v. *Terminal Construction Co.* (C.A. 2) 287 F.2d 382, 385; *El Hoss Engineer & Transport Co.* v. *American Ind. Oil Co.* (C.A. 2) 289 F.2d 346—escolio 1. ■

Hay serias consideraciones de política pública en esta esfera de relaciones del trabajo que nos harían pensar con detenimiento sobre la conveniencia de hacer cumplir judicialmente un laudo de esta naturaleza. Una de las preguntas a contestar es si no sería esa una manera indirecta en que el Poder Judicial asumiera el papel de legislar, en lugar de

tar un laudo de arbitraje, *esté o no dicho laudo incluido en los términos de un convenio colectivo,* constituye una práctica ilícita del trabajo, que no lo es bajo la legislación federal, aquí la Junta no trató el asunto como práctica ilícita sino que ha invocado el poder judicial directamente para imponer el laudo.

resolver controversias judiciales o cuasi-judiciales. Por otra parte, dada la naturaleza de la contratación colectiva otros inconvenientes se han apuntado.(⁷)  No estamos resolviendo ahora que tampoco pondríamos en vigor un laudo de este tipo en una situación cubierta únicamente por nuestras leyes locales del trabajo.  Repetimos que hay en ello envuelto una seria cuestión de orden público y sería preferible que la Legislatura, antes que el Tribunal, hiciera la decisión de lo que más conviniere.

*A tenor de todas las anteriores consideraciones se pondrá en vigor la parte del laudo que dictaminó (1) que el convenio colectivo entre la Unión y los Patronos expiró el 30 de noviembre de 1960; (2) que la Unión notificó en tiempo hábil a los Patronos su deseo de efectuar negociaciones y que esta notificación impidió la renovación automática el 1ro, de diciembre de 1960 de los convenios existentes. Aplicando a estos Patronos la norma de ley federal, unido al hecho de la seria duda que surge en cuanto a si el convenio de sumisión autorizó o no al árbitro a redactar por sí mismo, obligatorio para las partes, todas las cláusulas de un nuevo convenio colectivo, el Tribunal no pondrá en vigor la parte del laudo que consiste en dicho nuevo convenio colectivo.   (Apéndice A.)*

---

(⁷) Véase en forma breve y sintética la exposición del problema en *Federal Enforcement of Agreements to Arbitrate New Contract Terms, Quasi-Legislative* v. *Quasi-Judicial Arbitration*, Northwestern University L. R., Vol. 52. págs. 384-294.

## APENDICE "A"

Anexo A—LAUDO EMITIDO POR EL ÁRBITRO
EDUARDO GRACIA.
10 de agosto de 1961.

### CONVENIO COLECTIVO ENTRE

## VALENCIA BAXT EXPRESS, INC.

y

## SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC, GULF, LAKES AND INLAND WATERS DISTRICT, AFL–CIO (PUERTO RICO DIVISION)

— o —

### CONVENIO COLECTIVO ENTRE

## MARITIME TRUCKING COMPANY, INC.

y

## SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC, GULF, LAKES AND INLAND WATERS DISTRICT, AFL–CIO (PUERTO RICO DIVISION)

### COMPARECEN

DE UNA PARTE: .................. representada por un miembro de la Compañía debidamente autorizado, el que para los efectos de este convenio se llamará la "Compañía", y

DE OTRA PARTE: LA SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, representada por sus oficiales debidamente autorizados, la cual para los efectos de este convenio se llamará la "Unión".

### Y DECLARAN

Que ambas partes convienen por el presente para conservar las buenas relaciones entre patrono y obreros, en contratar como lo hacen bajo los siguientes términos y condiciones:

## Artículo I
## RECONOCIMIENTO DE LA UNION

La Compañía reconoce a la Seafarers International Union of North America, como una organización obrera *bona fide* y acepta a dicha Unión como la representante exclusiva de los chóferes, helpers y mecánicos de la Compañía en la Isla de Puerto Rico, excluyendo específicamente los empleados de oficina, ejecutivos, capataces, supervisores y cargo clerks, para contratar colectivamente con respecto a la escala de salarios, horas de trabajo y otras condiciones que surjan del empleo de dichos trabajadores.

## Artículo II
## TALLER UNIONADO

Será una condición de empleo, que todos los empleados de la Compañía cubiertos por este Convenio deberán en el trigésimo primer día siguiente a la fecha del otorgamiento de este Convenio, hacerse miembros de la Unión y permanecer como tales "in good standing". Será también una condición de empleo que todos los empleados cubiertos por este Convenio y a quienes se les dé empleo en o después de la fecha del otorgamiento de este Convenio, deberán en el trigésimo primer día siguiente a la fecha de su empleo ingresar en la Unión y permanecer en ella como miembros "in good standing".

La Compañía conviene en que despedirá, a solicitud escrita de la Unión, a cualquier empleado cubierto por este Convenio que deje de hacerse miembro de la Unión en el período especificado o que no permanezca en la Unión como miembro "in good standing", sujeto a las disposiciones aplicables de ley.

## Artículo III

*Selección de Nuevo Personal*

A. Siempre que sea necesario seleccionar nuevo personal, la Compañía avisará a la Unión con no menos de 24 horas de anticipación su propósito de emplear dicho nuevo personal.

B. En tal caso la Unión le recomendará dicho personal a la Compañía, y ésta retendrá la facultad a su entera discreción de aceptarlo o rechazarlo.

C. Si la Unión no pudiere suplir el personal, la Compañía podrá entonces tomar empleados del mercado abierto de trabajadores.

*Período Probatorio*

Se conviene que el nuevo personal se considera personal probatorio por un período de treinta días a contar de la fecha de empleo y la Compañía podrá despedir dicho personal o empleado por cualquier razón dentro de dicho período probatorio. Durante este período probatorio, los empleados recibirán los salarios provistos en este Convenio, pero no podrán disfrutar del Fondo de Bienestar y demás beneficios de este Convenio, salvo lo dispuesto por ley. En el caso de que un empleado probatorio continúe en su empleo después de la expiración del período probatorio, entonces todos los beneficios provistos en este Convenio serán aplicables en relación a él, en forma retroactiva a la fecha en que empezó a trabajar.

## Artículo IV

## DIA DE TRABAJO Y SEMANA DE TRABAJO

(a) Ocho (8) horas constituirán un día de trabajo y cuarenta (40) horas constituirán una semana de trabajo.

(b) La novena hora de trabajo en exceso de ocho (8) horas dentro de un período de veinticuatro (24) horas consecutivas será pagada a razón de doble tiempo del salario regular del empleado, y las horas trabajadas en exceso de la novena hora dentro de un período de veinticuatro (24) horas consecutivas serán pagadas de tiempo y medio del salario regular por hora.

(c) Las horas trabajadas en exceso de cuarenta (40) horas a la semana serán pagadas a tiempo y medio del salario regular del empleado.

(d) Todas las horas trabajadas los domingos serán pagadas a doble tiempo. Cuando se trabajaren los días feriados que se indican en este Convenio, las horas trabajadas en dichos días se pagarán a doble tiempo del tipo regular de salario que devengue el empleado.

(e) Se conviene y acuerda que en cualquier domingo y día feriado que se trabaje más de ocho (8) horas, el tiempo doble para el pago de las extras se computará sobre el salario regular que devengue el empleado, durante el día feriado o el domingo de trabajo de que se trate.

(f) En cualquier semana en que se trabaje durante el domingo o día feriado en horas en exceso durante cual-

quier otro día, la paga extra que se haya satisfecho por cualquiera de estos conceptos sobre el jornal regular del empleado se abonará a lo que pueda corresponder al empleado al calcular el exceso de las cuarenta (40) horas.

(g) El horario de la Compañía será de 8:00 A.M. a 12:00 P.M. y de 1:00 P.M. a 5:00 P.M. El horario se puede cambiar siempre que se le notifique al obrero el día anterior.

(h) A las 9:30 de la mañana los empleados podrán disfrutar de un descanso de diez (10) minutos y de otro período de descanso de diez (10) minutos a las 3:00 P.M. sin descuento alguno en la paga de dichos empleados.

## Artículo V

### DIAS FERIADOS

Se considerarán como días feriados con paga los siguientes: Año Nuevo, Viernes Santo y Día de Navidad. El trabajador que sea requerido para trabajos durante cualesquiera de dichos días feriados, percibirá salario a razón de tiempo doble del jornal regular que estuviere devengando en esos momentos.

## Artículo VI

### ARBITRAJE

A. La Unión nombrará un representante en cada departamento de la Compañía que está incluido dentro de la unidad contratante. La Unión notificará a la Compañía por escrito dándole a conocer los nombres de los representantes del departamento, y cuando se hicieran cambios, la Unión los notificará prontamente a la Compañía por escrito.

B. Si surgiere cualquier controversia, disputa, conflicto o cualquier mala interpretación por cualquier motivo entre la Unión y la Compañía que envuelva el significado y la aplicación de este Convenio, o cualquier controversia, disputa o conflicto entre la Unión y la Compañía sobre la disciplina, suspensión o despido de uno o de más empleados, o variación alguna en las condiciones de trabajo, dicho asunto será resuelto en forma final e inapelable, conforme a la siguiente manera:

## PRIMER PASO

El empleado, a través del representante de la Unión, discutirá el asunto con el Jefe del Departamento no más tarde de tres (3) días laborables después de haber surgido el incidente o motivo de agravio. Dentro de dos días laborables desde que se le somete el asunto al Jefe de Departamento, éste presentará su contestación para el arreglo del mismo.

## SEGUNDO PASO

1. Si no se llega a ningún acuerdo dentro del período antes establecido, el Comité de Quejas y Agravios, compuesto por dos (2) representantes de la Compañía y dos (2) representantes de la Unión, tendrá jurisdicción para entender y resolver el asunto.

2. No más tarde de tres (3) días laborables después de conocerse la decisión del Jefe de Departamento, la Unión, si desea proseguir con el caso, radicará una querella escrita exponiendo los hechos del asunto ante el Comité y notificando al mismo del día y hora de la reunión.

3. Una vez radicada con el Comité de Quejas y Agravios la querella antes mencionada, el Comité se reunirá y dará su consideración a las alegaciones de las partes, tomando, si fuere necesario, la evidencia pertinente del caso. El Comité considerará únicamente los hechos pertinentes al caso en cuestión. El Comité deberá emitir su fallo dentro de los cinco (5) días laborables (exceptuando los sábados, domingos y los días feriados especificados en el Artículo V de este Convenio) siguientes a la fecha en que la Unión haya radicado su querella.

## TERCER PASO

Si el Comité de Quejas y Agravios no pudiese emitir su fallo dentro del término antes establecido, solicitará que el Negociado de Conciliación y Arbitraje del Departamento del Trabajo de Puerto Rico designe un quinto miembro para actuar con los miembros del Comité para resolver el asunto lo más pronto posible. El Comité así compuesto de cinco (5) miembros tendrá entonces facultad para resolver definitivamente el asunto, después de haber visto el caso en su fondo.

C. El Comité de Quejas y Agravios tendrá jurisdicción en los casos en los cuales la Unión alegue que un empleado o empleados han sido disciplinados, suspendidos o despedidos sin justa causa; disponiéndose, sin embargo, que para la Unión

o un empleado tener derecho a llevar un caso ante el Comité de Quejas y Agravios, el empleado afectado deberá haber trabajado para la Compañía por lo menos treinta y un (31) días laborables.

D. Las decisiones del quinto miembro serán finales e inapelables.

E. El Comité de Quejas y Agravios no tiene jurisdicción para alterar, enmendar o modificar las disposiciones de este Convenio.

F. Dentro de los cinco (5) días siguientes a la fecha del otorgamiento de este Convenio las partes nombrarán representantes al Comité de Quejas y Agravios y nombrarán además, dos suplentes por cada parte. Ambas partes tienen el derecho a cambiar sus representantes en el Comité, pero deberán notificar prontamente por escrito a la otra parte de dichos cambios.

## Artículo VII
### DESCUENTO DE CUOTAS (Check-off)

La Compañía deducirá de los jornales de cada uno de los empleados cubiertos por este Convenio que haya radicado con la Compañía su consentimiento escrito individual para tal propósito, en la forma prescrita por ley, las cuotas semanales que dichos empleados adeudaren por ese concepto como miembros de la Unión después de la fecha de este Convenio. La Compañía entregará, a más tardar cinco (5) días laborables después del último período de paga de cada mes, un cheque pagadero a la Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, Puerto Rico Division, AFL-CIO, cubriendo las sumas así deducidas y retenidas, al tesorero y otro oficial designado por la Unión como custodio de los fondos de la misma que presente a la Compañía prueba fehaciente de que dicho tesorero u oficial ha prestado la fianza requerida por la Ley 17 del 17 de abril de 1961, según enmendada.

## Artículo VIII
### VACACIONES Y LICENCIA POR ENFERMEDAD

(a) Todo empleado tendrá derecho a vacaciones, con sueldo completo que se hará efectivo al comenzar a disfrutarlas, las cuales vacaciones consistirán de ciento cuatro (104) horas laborables al año. Las vacaciones se concederán a solicitud del empleado en forma que no interrumpan la buena marcha del

negocio, a cuyo fin la Compañía establecerá los turnos correspondientes. Podrán acumularse hasta un máximo de dos (2) años. Cuando un empleado cese en su trabajo la Compañía le hará efectivo el total hasta entonces acumulado. Si el salario no se ha estipulado por días o períodos mayores, la compensación correspondiente a cada día de vacaciones se determinará multiplicando por ocho (8) horas el tipo por hora regular devengado al momento de concederse las vacaciones.

(b) Todo empleado regular tendrá derecho en caso de ausencia por enfermedad comprobada mediante certificación médica, a recibir el salario de ocho (8) horas por cada día de enfermedad, a tipo básico sencillo, hasta un límite de diez (10) días laborables por año.

(c) En caso de accidente del trabajo que incapacite al obrero lesionado para continuar trabajando, la Compañía le pagará el salario correspondiente a diez (10) horas de trabajo durante la primera semana del accidente, siempre y cuando que el Fondo del Seguro del Estado declare compensable dicho accidente.

### Artículo IX
### FONDO DE BIENESTAR

A. La Compañía acuerda inmediatamente ser parte de este Convenio y de esta Declaración del Fondo de Bienestar conocido como Fondo de Bienestar de la Seafarers International Union (División de Puerto Rico) y contribuirá de aquí en adelante durante la vigencia de este Convenio con la cantidad de ocho y medio centavos (8-½¢) por empleado por hora por cada hora trabajada y además pagará ocho y medio centavos (8-½¢) por empleado por hora por cada día de licencia por enfermedad, días feriados y vacaciones. A los efectos de este Artículo cada uno de los días por vacaciones, enfermedad o días feriados comprenderá ocho (8) horas.

La Compañía se compromete en todo caso a pagar una contribución semanal mínima al Fondo de Bienestar de $2.80.

B. La Compañía se compromete a enviar el cheque de la contribución conjuntamente con una lista conteniendo el nombre, seguro social y horas trabajadas por cada empleado durante los primeros cinco (5) días siguientes a la terminación de cada mes.

C. El Fondo de Bienestar será administrado por cuatro Síndicos, dos nombrados por la Unión y dos nombrados por el Patrono, y de acuerdo con las leyes aplicables al efecto.

## Artículo X
## ANTIGUEDAD

En caso de suspensión de obreros por falta de trabajo, la suspensión se hará por orden de antigüedad, suspendiéndose en primer lugar los últimos obreros contratados, esto es, en el trabajo que hubiere, la Compañía empleará los trabajadores de mayor antigüedad en la misma. Una vez se haya normalizado el trabajo y la Compañía necesitare nuevamente más empleados, volverá a coger ese personal en el mismo orden, empleando primero a aquellos que por más tiempo hayan prestado sus servicios a la misma. Se perderá el derecho de antigüedad por las siguientes razones:

a. Por renuncia voluntaria del obrero.
b. Despido por justa causa.
c. Ausencia continua sin autorizar por la Compañía por más de cinco días.
d. Cesantía por falta de trabajo en la Compañía por más de tres meses consecutivos.

## Artículo XI
## DISPOSICIONES GENERALES

A. *Seguridad Personal:* La Compañía no obligará a ningún empleado a usar vehículos, equipo, instrumentos o maquinaria que no ofrezca seguridad contra los riesgos.

B. *Prerrogativa de la Administración:* Se conviene que la operación del negocio de la Compañía y la dirección de los empleados, incluyendo la preparación y promulgación de reglas razonables, para asegurar el orden y las operaciones de la Compañía, la determinación de la habilidad de los empleados, el derecho a emplear, trasladar, ascender, despedir por justa causa, suspender por escasez de trabajo, son derechos de la Compañía, excepto allí donde se permite el derecho de apelar a través del procedimiento de arbitraje de este Convenio.

Cualesquiera de los derechos, poder o autoridad que la Compañía tenía antes de la firma de este Convenio, la Compañía los retiene, con excepción de aquellos específicamente limitados en este Convenio.

C. Mientras la Compañía tenga equipo suficiente y disponible no utilizará el equipo de ninguna otra persona. Si la Compañía arrendare un camión o "trailer" sin chófer, entonces utilizará en dicho camión o "trailer" personal de la Compañía.

D. *Tablón de Edictos:* (Bulletin Board) La Compañía instalará en su sitio de trabajo (premises) un tablón de edictos en el cual la Unión podrá fijar sus noticias, cartas circulares, o informes relativos al trabajo bajo este Convenio.

E. *Herramientas:* (Tools) La Compañía suplirá a sus mecánicos aquellas herramientas necesarias para realizar su trabajo. Los empleados firmarán un recibo por dichas herramientas. Los mecánicos serán personalmente responsables por dichas herramientas las cuales siempre serán propiedad de la Compañía. La Compañía se compromete a instalar un sitio adecuado para guardar dichas herramientas.

F. *Visita de Oficiales de la Unión:* La Unión, a través de sus representantes, tendrá el derecho de hacer visitas al sitio de trabajo de la Compañía.

La Compañía, a requerimiento de la Unión suministrará aquella información y datos relacionados con los empleados cubiertos por este Convenio, siempre y cuando que dichas visitas no interrumpan las labores de la Compañía.

G. *Asistencia Legal y Gastos:* Cuando obreros cubiertos por este Convenio tuvieren que asistir a las cortes de justicia en relación con accidentes o casos de ley de tránsito ocurridos en el servicio, la Compañía pagará el tiempo perdido a tipo básico sencillo, siempre que los obreros acusados fueran absueltos; disponiéndose, además, que si a pesar de que la Corte declarara culpable al empleado, la Compañía se convenciere de que no existe culpabilidad real de parte del empleado, la Compañía pagará la multa que se le impusiere.

La Compañía pondrá fiadores para empleados que fueren arrestados por actos relacionados con el servicio y dentro de sus funciones y horas laborables del mismo.

Cuando un chófer fuere denunciado por estacionar mal mientras estuviere cargando o descargando el camión, la Compañía pagará dicha multa. Igualmente la Compañía pagará las multas que se le impusiere a sus chóferes por no llevar el equipo que la Ley de Tránsito requiere que se lleve en los camiones.

H. *Trabajo en días Feriados y Días Libres:* Ningún empleado podrá ser disciplinado por inhabilidad para trabajar extra durante días feriados o su día libre. La Compañía tiene el de-

recho de requerir a sus empleados para trabajar en todos los demás días de acuerdo con el horario regular de la Compañía.

I. *Traslados con Igual Sueldo:* (Upgrading) Si un empleado es promovido a un trabajo de mayor remuneración que la que él devenga en su empleo regular, dicho empleado recibirá la paga de la remuneración mayor durante el tiempo que esté trabajando en el trabajo a que fue promovido.

Si un empleado es provisionalmente trasladado de su clasificación a una clasificación de un salario menor, continuará recibiendo su paga regular. Si un empleado es nombrado en una clasificación de menor remuneración con motivo de suspensión de trabajo (lay off), él recibirá únicamente la paga de esa clasificación de menor paga.

J. *Ausencia sin paga:* (Leave of Absence) La Compañía, a solicitud de cualquiera de sus empleados, le concederá licencia para ausentarse sin paga por un período de tiempo que no excederá de treinta (30) días, siempre y cuando que haya disponible un sustituto cualificado. Antes de expirar dicho período de treinta (30) días, el empleado podrá, por escrito, requerir una extensión del período de dicha licencia por un término de treinta (30) días más y la Compañía podrá concederlo. Si esa licencia sin paga es concedida, los derechos de antigüedad del empleado serán preservados en su favor. Si no regresare a su trabajo después de vencido dicho término, excluyendo casos por enfermedad debidamente notificados y certificados, el empleado perderá sus derechos de antigüedad.

K. Este convenio, durante su vigencia, obligará a los sucesores o cesionarios de las partes contratantes, y redundará en beneficio de los mismos.

L. (1) La Compañía conviene en tener los vehículos en buenas condiciones al entrar al servicio los chóferes, salvo casos de reparaciones mayores en que el equipo tiene que permanecer por más tiempo en el garage.

(2) Los trucks que salgan a la Isla llevarán una goma de repuesto. Esta goma saldrá con el camión directamente del garage.

M. Los ascensos deberán hacerse por escalafón de acuerdo con los años de servicio y eficiencia de los empleados.

N. La Compañía equipará en el almacén un botiquín para cualquier emergencia de lesión que ocurra durante el trabajo a cualquier obrero.

O. La Compañía proveerá agua potable para los trabajadores en el almacén de carga de todos sus terminales y mantendrá en un sitio visible de cada almacén un reloj de pared que marque las horas con exactitud.

P. Habrá por lo menos un "helper" en cada unidad. En casos de rotura de un camión por la Isla, el "helper" permanecerá en el sitio hasta que el chófer avise a la Compañía, y después se quedarán los dos en el camión hasta que se cumplan las instrucciones de la Compañía. Ambos empleados serán compensados con su salario regular o el pagadero por tiempo adicional, según sea el caso.

Q. El chofer ayudará a su ayudante o ayudantes en la carga y descarga de los camiones o "trailers". Igualmente los chóferes serán responsables del equipo que se entregue por la Compañía.

R. Se entiende que la Unión no negociará ningún convenio colectivo con ninguna otra compañía en la cual se fijarán escalas de salarios o beneficios económicos inferiores a los obtenidos en este convenio.

S. Será discrecional de la Compañía el número de empleados a usarse en los trucks o camiones durante los viajes de entrega y recogida de carga; disponiéndose, que siempre habrá un ayudante en cada unidad. Si la unidad hace más de una parada para distribuir o recibir carga que no sea terminal de la Compañía, entonces tendrá Helper.

## Artículo XII
### COMPENSACION MINIMA

A. Todo empleado que haya empezado a trabajar su turno regular o que habiendo sido específicamente requerida para trabajar, no pudiere trabajar, estando disponible, tendrá derecho a percibir la paga correspondiente a cuatro (4) horas de trabajo a su tipo por hora regular de paga. Dicha garantía no será aplicable en caso de fuego, terremoto, huracán o inundación. En tal caso, el empleado solamente devengará la paga correspondiente a las horas realmente trabajadas.

En aquellos casos en que la interrupción sea causada por falta de electricidad, la Compañía retendrá al empleado durante una (1) hora por cuenta de la Compañía, y si al cabo de este período no se hubiere corregido la causa de la interrupción, la compañía no vendrá obligada a compensar mayor tiempo que la hora especificada.

B. La Compañía podrá retener al empleado durante las expresadas cuatro (4) horas ya en espera de oportunidad para empezar la labor, o en el desempeño de cualquier otra labor.

C. La garantía mínima de cuatro (4) horas sólo será devengada una sola vez en el primer turno de trabajo del empleado, ya sea este turno por la mañana o por la tarde.

### Artículo XIII
### SALARIOS

Los salarios a pagarse a los trabajadores incluidos en la Unidad apropiada serán los que aparecen en el Apéndice A que se une y se hace formar de este Convenio.

Dichos salarios se pagarán en todos los casos en forma retroactiva desde el 17 de marzo de 1961 en adelante.

### Artículo XIV
### HUELGAS Y CIERRES

A. Durante la vigencia de este Convenio, la Unión, sus oficiales y agentes no instigarán, promoverán, patrocinarán ni participarán en huelga, reducción en el ritmo del trabajo, (slow down) cese en el trabajo, o cualquier otra interrupción de la producción. La Unión no será responsable bajo esta sección cuando sus oficiales, agentes o delegados no instigaren, promovieren, patrocinaren o participaren en cualquier huelga organizada, reducción en el ritmo del trabajo, cese en el trabajo o cualquier otra interrupción de la producción.

B. En caso de que ocurrieren tales actos no autorizados por la Unión, ésta al recibir notificación de los mismos, instará e instruirá inmediatamente a sus miembros a regresar al trabajo, y dentro de 24 horas después de haber sido notificada por la Compañía de tal estado huelgario, dirigirá una carta a la Compañía notificándole que la acción tomada por los miembros de la Unión no era autorizada.

C. La Compañía tendrá derecho de imponer medida disciplinarias, a cualquier empleado que participe en actos no autorizados por la Unión como huelga, reducción en el ritmo del trabajo, cese en el trabajo, o cualquier otra diferencia con la producción durante la vigencia de este Convenio. Tales empleados pueden solventar esta cuestión mediante el procedimiento de agravios establecido.

D. La Compañía no recurrirá al cierre forzoso (lockout).

## Artículo XV
## VIGENCIA

Este Convenio entrará en vigor el 1 de diciembre de 1960 y continuará en vigor por un período de dos años a partir de dicha fecha.

### APENDICE A
### SALARIOS RETROACTIVOS A 17 DE MARZO DE 1961

A. Trabajos durante horas regulares.

|                           | *Salario por hora* |
|---------------------------|---------|
| Chóferes de trailers      | $1. 30  |
| Chóferes de camiones      | $1. 23  |
| Ayudantes de Chófer       | $1. 05  |
| Mecánicos                 | $1. 30  |
| Ayudantes de Mecánicos    | $1. 20  |
| Trabajadores de Almacén   | $1. 15  |

B. En caso de aumento del salario mínimo legal vigente, por orden federal o por decreto estatal, las clasificaciones afectadas por ley, tendrán un salario de 5 centavos por sobre el mínimo legal, y en caso de que por disposición legal hubiere clasificaciones así afectadas también aumentarán cinco centavos por sobre el salario actual. Se mantendrá el diferencial entre las clasificaciones de salarios.

C. Las partes negociarán el salario de empleados en cualesquiera otras clasificaciones en adición a las ya relacionadas en el Apartado A precedente.

D. Los salarios acordados en este Artículo no aplican a chóferes de vehículos dedicados a la transportación de productores de gasolina y petróleo.

Si la Compañía entrare en ese campo de transportación, negociarán los salarios de tales chóferes con la Unión.

E. Se aclara que respecto a los casos en que sea necesario negociar salarios nuevamente, la Unión y los trabajadores retienen su derecho de huelga.

10 de agosto de 1961.